**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| SOVERAIN IP, LLC, | |
| *Plaintiff,* | Civil Action No._____ |
| v. | |
| | **JURY TRIAL DEMANDED** |
| CHARTER COMMUNICATIONS, INC.; SPECTRUM MANAGEMENT HOLDING COMPANY, LLC F/K/A TIME WARNER CABLE, INC.; AND NAVISITE, LLC. | |
| *Defendants.* | |

<u>COMPLAINT FOR PATENT INFRINGEMENT</u>

Plaintiff Soverain IP, LLC ("Soverain" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent Nos.: 7,191,447 ("the '447 patent"); 8,606,900 ("the '900 patent"); and 5,708,780 ("the '780 patent") (collectively, the "patents-in-suit" or the "Soverain Patents"). Defendants Charter Communications, Inc. ("Charter"), Spectrum Management Holding Company, LLC f/k/a Time Warner Cable, Inc. ("Spectrum-TWCI"), and Navisite, LLC ("Navisite") (collectively, "Spectrum" or "Defendant") infringes each of the patents-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq*.

<u>INTRODUCTION</u>

1.      This case arises from Spectrum's infringement of Soverain's data extraction and network management patent portfolio. Soverain is the owner by assignment and exclusive licensee to twenty-four issued United States patents, multiple pending patent applications,[1] and numerous foreign patent assets.[2]

2.      The patents asserted in this case arose from the innovative work of Open Market, Inc. ("Open Market"), an innovative tech firm that in 1993 developed groundbreaking

---

[1] *See* U.S. Patent App. Nos. 11/300,245; 11/971,361; 12/109,443; 14/047,547.

[2] *See e.g*., JP 4485548, JP 3762882B2, EP 0803105B1, DE 69633564T2.

technologies for the then-nascent Internet.  Open Market was founded at a time when conducting commercial transactions over the Internet was in its beginning stages.  Previous uses of the Internet had largely been limited to academic research and military defense work.

3.      Professor David K. Gifford of the Massachusetts Institute of Technology, co-founder of Open Market, and inventor of fourteen of the Soverain patents, recognized the potential of enabling secure transactions over computer networks.  Professor Gifford and other Open Market employees raced against other companies to bring one of the first secure transaction management systems to market.  With the technology developed, Open Market filed for the patents that would comprise the two Soverain Patent Portfolios.

4.      Spectrum has stated before the United States Patent Office that "conventional techniques" of managing access to content from different hosts "suffer from deficiencies" including the ability to "to view content available from different service providers, the subscriber must switch between operating different devices to view content available from the different service providers."[3]

5.      Spectrum's patents identify prior art (contemporaneous to the Soverain patents), as failing to enable aggregation content from a variety of hosts, "Additionally, the equipment or services may not interoperate with one another, thus reducing the overall utility provided to the user, and increasing their frustration level."[4]  The same Spectrum patent proposes as a solution in which "the content is delivered to the first device via a third network that is substantially independent of the first network."[5]

> ***Conventionally, interaction with data centers was not highly automated***. When a data center's customer wanted to, for example, modify the network configuration of the system which was being provided to them on an outsourced basis by a data center, it was common for someone in the customer's IT department to contact the

---

[3] U.S. Patent No. 8,925,017, Col. 1:55-58 (assigned to Time Warner Cable Enterprises LLC as Reel/Frame No. 29499/735 December 18, 2012).

[4] U.S. Patent No. 8,621,540, Col. 2:2-4.

[5] U.S. Patent No. 8,078,696

data center either via telephone, email or via a portal where the customer would sign in with credentials to request the change. [6]

***To manage the web site the user either goes directly to the hosting service facility or employs software tools for remotely accessing the server*** and setting up the site to operate that user wishes. When the user is at the site, the host site administrator typically gives the user access to a network terminal and a shell account that allows the user to use the local operating system to load files and otherwise organize the web site.[7]

6.    Open Market's groundbreaking inventions led to the issuance of patents that comprise two technology portfolios: (1) the virtual shopping cart portfolio and (2) the network management and data extraction portfolio. The below diagram shows Soverain's patents, pending patent applications, and the Soverain patents Spectrum infringes.



[6] U.S. Patent No. 8,806,486 (assigned to TWCI at Reel/Frame 29423/733)/

[7] U.S. Patent App. No. 10/293,946 (filed November 13, 2002 with assignment filed at TWCI Reel/Frame 14096/471).

SOVERAIN COMPLAINT FOR PATENT INFRINGEMENT

Page 3 of 46

<u>SOVERAIN'S LANDMARK DATA EXTRACTION AND NETWORK TECHNOLOGIES</u>

7.      Open Market's flagship Internet transaction product, the Open Market Transact system ("Transact") offered a full suite of software technologies, including content management, authorization protocols, and customer relationship management.  Transact contained functionality for separating the management of transactions from the management of content, allowing companies to securely and centrally manage transactions using content located on multiple distributed Web servers.

8.      In 1995, Open Market began commercial shipment of Transact.[8]  Transact was quickly embraced by the market, and its early customers included: Novell,[9] Sprint,[10] Disney,[11] AT&T,[12] and Hewlett-Packard.[13]  In March of 1996, the New York Times described Open Market's transaction management products as being adopted by Time Warner, Banc One, and First Union.

> Open Market will be competing with Netscape's I-Store and Merchant Server of Microsoft. Besides Time Warner, Open Market has signed several big customers including Banc One, First Union Bank, Hewlett-Packard, Digital Equipment and

---

[8] Ellis Booker, *Internet Security Boosted,* COMPUTERWORLD at 14 (April 17, 1995) ("Last month, Open Market became the first vendor to release a Web server that supports both SHTTP and SSL.").

[9] Jessica Davis, *Novell, Open Market Ink Deal*, INFOWORLD at 6 (March 25, 1996) ("Novell has licensed OM-SecureLink commerce server software for the Internet, and plans to integrate OM-SecureLink with Novell's Web server by the third quarter.").

[10] *Sprint Chooses Open Market's Transact as Key Offering of its E-Commerce Services*, PRESS RELEASE (September 27, 2000) ("Sprint will host Transact and offer its functionality as a service for these enterprise sites.").

[11] Eric Nee, *Surf's Up*, FORBES ONLINE (July 27, 1998), available at: https://www.forbes.com/forbes/1998/0727/6202106a.html ("Today Open Market is a leading supplier of Internet commerce software.  More than 1,000 Web sites use Open Market software to transact business.  Its clients include Disney, which sells on the Internet everything you can buy in one of its shopping mall stores, and Analog Devices, which allows engineers to find and order examples of integrated circuits on its Web site.").

[12] Jeff Symoens, *Transact 3.0: Scalable Solution*, INFOWORLD at 68 (September 8, 1997) ("AT&T is using Transact as part of SecureBuy, a service that gives merchants the infrastructure to run an electronic store on the internet.").

[13] *HP And Open Market Offer Mission-Critical E-Commerce Services*, HP OPEN MARKET PRESS RELEASE (November 18, 1998) ("Open Market is the first member of HP`s Domain Commerce alliance program to integrate HP`s MC/ServiceGuard with its products.").

Bloomberg, the financial publisher. Time Warner has been offering electronic versions of Time, People, Sports Illustrated, Money and other publications free on its Pathfinder Web site.[14]

9.      By the late 1990s, Transact was an established market leader in e-commerce technology, commanding dominant market share of the transactional software market against companies like Microsoft and IBM.[15]

10.      The following collection of news articles shows some of the headlines that Open Market's Transact product garnered in the computer industry press from 1996 to 2000.



Sandy Reed, *First-Ever Review of I-commerce System Right For New Section Debut*, INFOWORLD at 73 (September 8, 1997); Matthew Nelson, *Open Market adds Object Support to I-commerce Product*, INFOWORLD at 58 (February 16, 1998.); Ellen Messmer, *Open Market to Liven Up Web-Based Publishing*, NETWORK WORLD at 16 (November 9, 1998); Mitch Wagner, *Open market Upgrade Will Support Big Business On 'Net*, COMPUTERWORLD at 8 (December 9, 1996); Ellen Messmer*, Open Market to Debut e-Comm Tools*, NETWORK WORLD at 12 (March

---

[14] Glenn Rifkin, *Open Market Hopes It'll be Next Netscape*, N.Y. TIMES (March 4, 1996).

[15] Eric Nee, *Surf's Up*, FORBES ONLINE (July 27, 1998); *3 Big New Customers for Open Market, Inc.*, N.Y. TIMES (April 24, 1995) ("Open Market Inc. will announce today that three major media companies will use its software and services to provide content and conduct business on the Internet. A privately held company based in Cambridge, Mass., Open Market said it had signed agreements to provide technology to the Tribune Company, Advance Publications and the Time Inc. unit of Time Warner.").

27, 2000); Kim Nash, *Open Market Aids Web Site Upkeep*, COMPUTERWORLD at 12 (March 11, 1996).

11.    The inventors of the Soverain Patents include Open Market's founders and engineers.  The inventors of the Soverain Patents comprise:

12.    Professor David K. Gifford is a professor of electrical engineering and computer science at the Massachusetts Institute of Technology ("MIT") and co-founder of Open Market. Mr. Gifford has been a member of the MIT faculty since 1982 and leads the Programming Systems Research Group at the MIT Laboratory for Computer Science.  Professor Gifford is a named inventor on fourteen of Soverain's issued patents.[16]

13.    Professor Gifford is the author of over one hundred journal articles and his research areas focus on programming language development; information discovery, retrieval, and distribution; and computation using biological substrates.  Professor Gifford earned his S.B. in 1976 from MIT and his M.S. and Ph.D. in electrical engineering from Stanford.

14.    Professor Gifford was elected as a fellow by the Association for Computing Machinery, for "contributions to distributed systems, e-commerce and content distribution."[17]

15.    Dr. Lawrence Stewart was Open Market's Chief Technology Officer.  Dr. Stewart is the co-inventor of nine of Soverain's patents.[18]  Dr. Stewart previously held positions at Xerox Palo Alto Research Center ("PARC") and Digital Equipment Corporation.  Recently, when writing about his role as a co-inventor of Soverain's patents, Dr. Stewart described the intellectual effort behind the inventions.

> The relevant source code of the Open Marketplace system as of October 1994 was included with the patent application for anyone to read – over 50 printed pages of code.  In other words, ***Open Market showed that these inventions weren't just a theory but an actual working system.***  Open Market submitted the source code to

---

[16] *See* U.S. Patent Nos. 4,845,658; 5,812,776; 5,724,424; 6,279,112; 6,205,437; 6,195,649; 6,199,051; 6,049,785; 7,191,447; 7,124,092; 7,448,040; 8,935,706; 8,554,591; and 8,286,185.

[17] *Gifford Named ACM Fellow*, MIT COMPUTER SCIENCE AND ARTIFICIAL INTELLIGENCE LABORATORY NEWS (December 13, 2011), available at: https://www.csail.mit.edu/node/1651.

[18] *See* U.S. Patent Nos. 7,272,639; 6,449,599; 8,635,327; 8,606,900; 8,554,591; 5,715,314; 5,708,780; 5,909,492; and 7,668,782.

the Patent Office on microfiche since there was no way to submit machine readable appendices back in 1994.[19]

Dr. Stewart received an S.B. in Electrical Engineering from MIT in 1976, followed by M.S. and Ph.D. degrees from Stanford University in 1977 and 1981, respectively.  Dr. Stewart is also the author (with fellow Soverain patent inventor Winfield Treese) of the computer science textbook, *Designing Systems for Internet Commerce* (Addison-Wesley, 2002).

16.    <u>Dr. John R. Ellis</u> was Open Market's Architect and Technical Lead.  Dr. Ellis subsequently was the Senior Vice President of Engineering at AltaVista Internet and has held positions at Xerox PARC and Amazon.com.  Dr. Ellis is a named inventor of four Soverain patents.[20]  Dr. Ellis holds a Ph.D. from Yale University and BSE from Princeton University.

17.    <u>Dr. Daniel Earl Geer, Jr</u>. served as Director of, Engineering at Open Market and named inventor of two Soverain Patents.[21]  Dr. Geer was the former President of USENIX, the advanced computing systems association and served as Chief Scientist at Verdasys, Inc. and Digital Guardian, Inc. Dr. Geer holds degrees from Harvard University and MIT.

18.    <u>Winfield Treese</u> was previously the Associate Director of the Hariri Institute for Computing at Boston University.  Mr. Treese served as Open Market's Vice President of Technology where he was responsible for the security architecture of Open Market's products.  Mr. Treese is a named inventor of eight Soverain patents.[22]  Mr. Treese was the chair of the Transport Layer Security (TLS) Working Group of the Internet Engineering Task Force (IETF), the Internet standard successor to SSL.  Mr. Treese also chaired the 8th USENIX Security Symposium.  Mr. Treese is the co-author of the book *Designing Systems for Internet Commerce* (Addison-Wesley, 2002).

---

[19] Lawrence Steward, *The CAFC Got It Wrong in Soverain v. Newegg*, IPWATCHDOG.COM WEBSITE (December 30, 2013), available at: http://www.ipwatchdog.com/2013/12/30/the-cafc-got-it-wrong/id=47141/ (emphasis added).

[20] *See* U.S. Patent Nos. 7,448,040; 8,935,706; 8,286,185; and 7,191,447.

[21] *See* U.S. Patent Nos. 6,490,358 and 6,212,634.

[22] *See* U.S. Patent Nos. 7,448,040; 8,935,706; 8,286,185; 5,708,780; 7,272,639; 8,635,327; 8,606,900; and 7,191,447.

## SOVERAIN'S TRANSACT SYSTEM

19.     From 1996 through 2000, Open Market's product, Transact, was a leader in the e-commerce field, holding the majority of the global market for transaction management systems.[23] When the first Soverain patents issued in 1998, Open Market was hailed for its "secure, robust, distributed architecture." Jeff Symoens, *Transact 3.0: Scalable Solution*, INFOWORLD at 63 (September 8, 1998). Gary Eichorn, chief executive officer of Open Market, stated that Open Market was selling its "transaction engine to telecommunications companies, banks and Internet service providers. They're then offering commerce services to smaller companies." *HotSeat: Gary Eichorn, CEO of Open Market, Describes How Transactions Will Hit the Web*, INFOWORLD at 47 (March 17, 1997).

20.     Transact provided an end-to-end solution for secure transaction management over the Internet. Transact included the following components: (1) a transaction server for managing orders, (2) a subscription server for security and authentication by managing access to digital content, (3) a log server for secure management of log entries, and (4) a settlement server for managing the authorization of transactions. A review of Transact in InfoWorld magazine stated "if you're comfortable with Transact's $125,000 opening price tag, it offers an exceptional architecture and a strong feature set that will handle back-end transaction processing." Jeff Symoens, *Transact 3.0: Scalable Solution*, INFOWORLD at 63 (September 8, 1998).

21.     The following images of Soverain's Transact product show: (1) FastCGI configuration screen for keeping application processes running between requests (unlike CGI the system did not require extra overhead by requiring the system start a new process and initializing an application each time a request is made on the system); (2) a server status screen for monitoring the status of multiple hosts running Transact; (3) a maintenance screen for managing system maintenance; and (4) an account validation service setting screen for managing transaction security and authentication.

---

[23] *Investors Bid Up Internet Stock*, N.Y. TIMES (May 24, 1996) (In May 1996, Open Market made an initial public offering valuing the company at $1.2 billion.).



A COLLECTION OF IMAGES OF THE OPEN MARKET TRANSACTION SYSTEM (the numbered annotations correspond to the (1) FastCGI settings, (2) server status screen, (3) Transact maintenance settings, and (4) account validation settings).

22.     As the 2000s approached, larger technology companies entered the transaction management field; the dot-com bubble then burst.[24]  As a result, Open Market went through a restructuring and was purchased by Divine interVentures, Inc. ("Divine") for approximately $70 million in 2001.[25]  As a result of the purchase, Divine acquired Open Market's patent portfolio and its Transact software product.

23.     Divine was a venture capital investment company founded in May 1999.  Divine focused on "professional services, Web-based technology, and managed services."  *Id.*  At its

---

[24] *See* Editorial, *The Dot-Com Bubble Bursts,* N.Y. TIMES, Dec. 24, 2000, at WK8 (describing the aftermath of the dot-com bubble bursting).

[25] *Divine to Buy Open Market*, NETWORK WORLD at 8 (August 20, 2001) ("Professional services and software company Divine last week agree to buy struggling Open Market in a stock deal work about $59 million.").

peak, Divine employed approximately 3,000 people in more than 20 locations worldwide and offered approximately 50 software products.

24.    In 2003, Transact was acquired by Soverain Software.  Soverain Software also acquired the patents from the original Open Market inventors and innovators.



Jeff Symoens, *Transact 3.0: Scalable Solution*, INFOWORLD at 63 (September 8, 1998) ("Transact 3.0 is a comprehensive, high-end solution for processing Internet-commerce transactions.  Pros: Secure, robust, distributed architecture.").

## SOVERAIN'S PATENT PORTFOLIO

25.    Soverain's patents and published patent applications have been cited in over 6,000 issued United States patents and published patent applications as prior art before the United States Patent and Trademark Office.[26]  Companies whose patents and patent applications cite the

---

[26] The over 6,000 forward citations to the Soverain Patents do not include patent applications that were abandoned prior to publication in the face of the Soverain Patents.

Soverain patents include: Microsoft Corporation, Oracle Corporation, Facebook, Inc., AT&T, Inc., International Business Machines Corporation, Dell, Inc., etc.

      26.    It is difficult today to recall a time before Soverain's patented technology had become part of the platform used to operate many websites.  But prior to the mid to late 1990's, when the applications leading to the patents in suit were filed, nothing like the patented functionality had been devised, let alone implemented. The simplicity and intuitive features of the patented technology soon became apparent.  Almost overnight, companies abandoned older technologies that often required customers to dial in directly to specific sites, shop for products using function codes or other keypad commands, and fax or phone in orders rather than complete transactions online.



The above images show major Internet properties contemporaneous (and later) to the inventions conceived in the Soverain patents, including: (1) Microsoft.com (August 1995), (2) Amazon.com (July 1995), and (3) Apple.com (July 1997).

27.     The Soverain network management and data extraction patent portfolio includes technology that allows companies to streamline and secure the single sign-on process, extract data from hosts over a network, and authenticate and encrypt data using asymmetric keys.

28.     Soverain has maintained and developed the Open Market patent portfolio, which now consists of over 50 issued and pending U.S. and international patents covering key aspects of e-commerce technology.



Nick Wingfield, *Three Patents Lift Open Market as Observers Guess Their Worth*, WALL ST. J., Mar. 4, 1998 (reporting that one analyst stated: "The most important thing is that it will allow them to be acknowledged as a leader and be sought after for strategic relationships"); Matthew Nelson and Dylan Tweney, *Open Market Wins Three I-Commerce Patents*, INFOWORLD at 10 (March 9, 1998).

29.     Confirming the value of Soverain patents, licensees have paid millions of dollars for a license to practice the technology taught in the Soverain patents.  For example, Amazon.com, Inc. paid 40,000,000 dollars to license the Soverain patents.[27]

---

[27] Thom Weidlich, *Amazon.Com Set to Pay on Patents*, THE SEATTLE TIMES (August 12, 2005) ("Amazon.com, the world's largest Internet retailer, agreed to pay $40 million to Soverain Software to settle two lawsuits over patents related to online shopping.").

## THE PARTIES

### SOVERAIN IP, LLC

30.    McKinney, Texas based Soverain owns the intellectual property rights to information management solutions that allow companies and individuals to manage Internet content, encrypt network based information, and manage access to network based information.

31.    Soverain's principal place of business is located at 6851 Virginia Parkway, Suite 214, McKinney, Texas 75071.  Like Defendant Spectrum, Soverain relies on its intellectual property for its financial viability.

> ***TWC relies on patent, copyright, trademark and trade secret laws*** and licenses and other agreements with its employees, customers, suppliers and other parties to establish and maintain its intellectual property rights in technology and the products and services used in TWC's operations. Also, because of the rapid pace of technological change, TWC both develops its own technologies, products and services and relies on technologies developed or licensed by third parties[28]

32.    Spectrum's sale and distribution of products and services that infringe the patents-in-suit has caused and continues to cause injury to Soverain.

### SPECTRUM DEFENDANTS

33.    On information and belief, Charter Communications, Inc. ("Charter") is a Delaware corporation with its principal place of business at business at 400 Atlantic Street, Stamford, Connecticut 06901.  Charter may be served through its registered agent The Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington Delaware 19808.

34.    On information and belief, Charter has 2.56 million customers in the state of Texas.[29]

35.    On information and belief, Charter has numerous Texas based subsidiaries including: Time Warner Cable Information Services (Texas), LLC, Time Warner Cable Texas LLC, Charter Advanced Services (TX), LLC, and Charter Fiberlink TX-CCO, LLC.

36.    On information and belief, Charter has extensive facilities in the State of Texas including a call center in McAllen, Texas.[30]

---

[28] TIME WARNER CABLE INC. FORM 10-K FILING at 22 (February 12, 2016) (emphasis added).

[29] CCO HOLDINGS LLC FORM 10-K FILING at 11 (March 3, 2017).

37.     On information and belief, Spectrum Management Holding Company, LLC formerly known as Time Warner Cable, Inc. ("Spectrum-TWCI") is a Delaware corporation, having places of business at 60 Columbus Circle, 17th Floor, New York, New York 10023, and 400 Atlantic Street, Stamford, Connecticut 06901.  Spectrum-TWCI can be served through its registered agent Corporation Service Company located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

38.     On information and belief, Spectrum-TWCI's public statements confirm that it has a "long-standing relationship with the State of Texas."[31]

39.     On information and belief, one of Spectrum-TWCI's five major regional networks are located in the State of Texas.[32]  A significant share of Texas residents have only the option of purchasing cable television or broadband services from Spectrum-TWCI.[33]  In the Dallas-Ft. Worth, Texas Designated Market Area ("DMA") Spectrum-TWCI is estimated to control 84.6% of cable subscriptions.[34]

---

[30] CCO HOLDINGS. LLC FORM 10-K FILING at 9 (March 3, 2017) ("We are currently constructing a new call center in McAllen, TX which will solely serve customers who prefer to engage with us in Spanish, resulting in the creation of new jobs.").

[31] *Time Warner Cable Business Class (TWCBC) Awarded a Multi-Year Services Contract With the State of Texas Department of Information Resources (DIR),* TIME WARNER PRESS RELEASE (November 15, 2011) ("'This contract is a major win for Time Warner Cable Business Class and expands our long-standing relationship with the State of Texas,' said Michael Petty, regional vice president of business services, Time Warner Cable Business Class. 'State agencies will now be able to procure our fiber services and leading networking solutions to meet their growing technology and strict budgetary demands.'").

[32] TIME WARNER CABLE, INC. FORM 10-K FILING at 1 (2014) ("Time Warner Cable Inc. [] is among the largest providers of video, high-speed data and voice services in the U.S., with technologically advanced, well-clustered cable systems located mainly in five geographic areas – New York State (including New York City), the Carolinas, the Midwest (including Ohio, Kentucky and Wisconsin), Southern California (including Los Angeles) and Texas.").

[33] FCC, Public Notice, *Commission Accepts for Filing Applications of Charter Communications, Inc., Time Warner Cable, Inc., and Advance/Newhouse Partnership for Consent to Transfer Control of Licenses and Authorizations*, MB DOCKET NO. 15-149, DA 15-856, at 6 (July 27, 2015) (noting that proposed merger would give the combined company "denser geographic coverage" and "increasing density within multiple regions").

[34] *Petition to Deny of Public Knowledge, Common Cause, Consumers Union et al.,* MB DOCKET NO. 15-149 at 9 (October 13, 2015).

40.    On information and belief, Spectrum-TWCI maintains customer service centers and sales offices across the state.[35]

41.    On information and belief, NaviSite, LLC. ("NaviSite") is a Delaware Corporation with its principal place of business at 400 Minuteman Road, Andover, MA 01810. Navisite may be served with process by serving The Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington Delaware 19808.

42.    On information and belief, Navisite is a wholly owned subsidiary of Charter Communications, Inc.[36]

43.    On information and belief, Navisite employs sales representative in the State of Texas, including Channel Sales Managers located in Dallas and/or Austin, Texas.[37]

44.    On information and belief, Navisite has marketed its products at conferences in the State of Texas.[38]

45.    On information and belief, Navisite has filed cases in the State of Texas and availed itself of Texas courts.[39]

---

[35] *Spectrum Store Locator,* CHARTER COMMUNICATIONS WEBSITE, available at: https://www.charter.com/browse/content/storelocator.html (showing numerous Spectrum stores in the vicinity of Dallas Texas)

[36] *Navisite Announces Managed Cloud Services for Microsoft Azure,* NAVISITE PRESS RELEASE (July 13, 2016), available at: https://newsroom.charter.com/press-releases/2016/navisite-announces-managed-cloud-services-for-microsoft-azure/ ("Navisite LLC., a subsidiary of Charter Communications").

[37] *Navisite Channel Sales Manager Job Posting*, SPECTRUM JOBS WEBSITE, available at: https://jobs.spectrum.com/job/united-states/channel-sales-manager-navisite/4673/4215468

[38] *See also Lisa Capece vs NaviSite, Inc*., Case No. 03-02-00113 (Texas Court of Appeals, Third District 2009) (discussing in part Navisite's sponsorship of the Austin Players conference. Navisite "cosponsored the Austin Players Event, a technology awards banquet. Capece was a friend of Christopher Levy, an employee of NaviSite's San Diego office, who invited her as his guest to the banquet.").

[39] *See Navisite, Inc. vs. Olazaba, Jaime*, Case No. 2009-570, Texas County Court, El Paso County (filed February 3, 2009).

## JURISDICTION AND VENUE

46.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

47.     Upon information and belief, this Court has personal jurisdiction over Spectrum in this action because Spectrum has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Spectrum would not offend traditional notions of fair play and substantial justice.  Defendant Spectrum, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), has committed and continues to commit acts of infringement in this District by, among other things, offering to sell and selling products and/or services that infringe the patents-in-suit.  Moreover, Navisite, Charter, and Spectrum-TWCI are registered to do business in the State of Texas.  Navisite, Charter and Spectrum-TWCI have offices and/or employees in the State of Texas, and actively direct activities to customers located in the State of Texas.

48.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).  Defendants Navisite, Charter, and Spectrum-TWCI are registered to do business in the State of Texas, have offices and/or employees in the State of Texas, and upon information and belief, have transacted business in the Eastern District of Texas and have committed acts of direct and indirect infringement in the Eastern District of Texas.

## TECHNOLOGY BACKGROUND

### U.S. PATENT NO. 7,191,447

49.     U.S. Patent No. 7,191,447 ("the '447 patent") entitled, *Managing Transfer of Information in a Communications Network*, was filed on August 25, 2000, and claims priority to October 25, 1995.  The '447 patent is subject to a 35 U.S.C. § 154(b) term extension of 615 days.  Soverain is the owner by assignment of the '447 patent.  A true and correct copy of the '447

patent is attached hereto as Exhibit A.  The '447 patent claims specific methods and systems for managing transfers of information in communications networks such as the World Wide Web.

50.    All the claims in the '447 patent were subject to *inter partes* reexamination before the United States Patent Office.  The reexamination certificate confirming all claims was issued on October 5, 2012.  In addition to confirming the patentability of all claims of the '447 patent, 83 additional claims were added and determined to be patentable over multiple references that were not cited during the prosecution of the '447 patent.

51.    During the reexamination proceeding, the United States Patent and Trademark Office Board of Patent Appeals and Interferences confirmed the patentability of the claims over four references.[40]



"AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT: The patentability of claims 1-9 is confirmed.  New claims 10-92 are added and determined to be patentable."

Reexam Ctrl. No. 95/000,505, '447 Patent, Cert. Issued, October 5, 2012.

52.    The '447 patent teaches various techniques for managing transfers of information in public packet switched communications networks.  For example, the '447 patent teaches a system where a server receives data from one or more networked servers and merges the data into one or more master logs.  The '447 patent also teaches a system for implementing security protocols wherein a proxy server translates links between an incompatible network protocol to a

---

[40] *Decision of the United States Patent and Trademark Office Board of Appeals and Interferences*, Inter Partes Reexamination Control No. 95/000,505 (January 26, 2012).

compatible network protocol and then back-translates the link. The '447 patent also discloses a system for extracting data from sources of network-based information in a communication network using an object embedding program that locates a script program and causes the script program to extract data and make it available over a computer network.

53.    The '447 patent and its underlying application, foreign counterparts, and its related patents have been cited by 135 United States patents and patent applications as relevant prior art. Specifically, patents issued to the following companies have cited the '447 patent family as relevant prior art:

- International Business Machines Corporation
- Telefonaktiebolaget L M Ericsson
- Alcatel-Lucent USA, Inc.
- Juniper Networks, Inc.
- Yellowpages.Com LLC
- General Electric Company
- Microsoft Corporation
- Kaspersky Lab Zao
- Lucent Technologies, Inc.
- AOL, Inc.
- Facebook, Inc.
- Siemens Aktiengesellschaft
- Fujitsu Limited
- Vodafone Group plc
- Charles Schwab & Co., Inc.
- Salesforce.com, Inc.
- Samsung Electronics Co., Ltd.
- Amazon.com, Inc.

**U.S. PATENT NO. 8,606,900**

U.S. Patent No. 8,606,900 ("the '900 patent") entitled, *Method and System for Counting Web Access Requests*, was filed on April 12, 2000, and issued on December 10, 2013. The '900 patent is subject to a 35 U.S.C. § 154(b) term extension of 1,645 days. Soverain is the owner by assignment of the '900 patent. A true and correct copy of the '900 patent is attached hereto as Exhibit B. The '900 patent claims specific methods and systems for processing service requests from a client to a server through a network. In particular, the '900 patent teaches methods and

systems applicable to processing client requests in an HTTP (Hypertext Transfer Protocol) environment.

54.     The '900 patent teaches the processing of service requests from a client to a server through a computer network.  Specifically, the '900 patent describes forwarding a service request from the client to the server and appending a session identification to the request and to subsequent service requests from the client to the server within a session.  A session identifier may include an authorization identifier to allow a user to access controlled files.

55.     The '900 patent and its related patents have been cited by 139 United States patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '900 patent family as relevant prior art:

- Sprint Communications Company L.P.
- Qualcomm, Inc.
- Netscape Communications Corporation[41]
- SAP AG
- Facebook, Inc.
- AOL, Inc.
- Fuji Xerox Co., Ltd.
- About, Inc.
- Bellsouth Intellectual Property Corporation
- AT&T, Inc.
- Citrix Systems, Inc.
- International Business Machines Corporation
- Nokia Corporation
- Yahoo! Inc.
- Dell, Inc.
- Microsoft Corporation
- Paramount Pictures Corporation
- Cisco Systems, Inc.
- McAfee, Inc.

---

[41] Netscape Communications Corporation was originally founded under the name Mosaic Communications Corporation and was one of the early developers of web browsing technology. It was subsequently purchased by AOL, Inc.

SOVERAIN COMPLAINT FOR PATENT INFRINGEMENT

**U.S. PATENT NO. 5,708,780**

U.S. Patent No. 5,708,780 ("the '780 patent") entitled, *Internet Server Access Control and Monitoring*, was filed on June 7, 1995, and issued on January 13, 1998. Soverain is the owner by assignment of the '780 patent. A true and correct copy of the '780 patent is attached hereto as Exhibit C. The '780 patent claims specific methods and systems for controlling and monitoring access to network servers. In particular, the process described in the invention includes client-server sessions over the Internet involving hypertext files.

56.     The reexamination proceeding culminated with the United States Patent and Trademark Office confirming the patentability of all 45 claims of the '780 patent over 260 prior art references, including over 120 patent references.[42]



"AS A RESULT OF REEXAMINATION. IT HAS BEEN DETERMINED THAT: The patentability of claims 1-45 is confirmed. New claims 46-136 are added and determined to be patentable."

Reexam Ctrl. No. 90/007,183, '780 PATENT, CERT. ISSUED, APRIL 4, 2006.

57.     In addition to confirming the patentability of all claims in the '780 patent, the United States Patent and Trademark Office confirmed the patentability of 90 new claims which were added to the '780 patent.

---

[42] Reexam Ctrl. Nos. 90/007,183, '780 PATENT, CERT. ISSUED, APRIL 4, 2006.

58.    The '780 patent has been subject to review by Courts in the Eastern District of Texas.  In prior orders, the Court denied a motion for partial summary judgment that claims 28 and 32-42 are indefinite under 35 U.S.C. § 112.[43]

59.    The '780 patent teaches the use a "session identifier" to permit web servers to recognize a series of inquiries (or "service requests") from the same client during an online session, and to control and monitor the client's access to information on a website.  This technology is important due to the "stateless" nature of the Internet.

60.    The '780 Patent discloses the use of a web server that assigns a session identifier, which can be as simple as a string of text or numbers, in response to an initial service request from a client.  When the server receives a subsequent request with the same session identifier appended to it, the server can then associate that request with earlier requests.  The session identifier allows the web server to recognize the client during a series of requests and responses, to provide access to information resources which the user is authorized to access, and to monitor the user's access.

61.    The '780 patent discloses the use of a "session identifier" for operating on a "stateless network," such as the Internet, meaning that the system can simultaneously handle multiple communications from different users.  The claimed methods and systems achieve this, in part, by appending a unique "session identifier" to each user request.

62.    The '780 patent has been the subject of a *Markman* Order in the Eastern District of Texas.  Specifically, the Court interpreted seventeen disputed terms in the '780 patent.  The Court grouped the terms "in groups relating to: (1) path name in a URL, (2) session, (3) hypertext, (4) authentication server, and (5) means-plus-function elements."[44]

---

[43] *Soverain Software LLC v. Amazon.com, Inc.*, Case No. 04-cv-00014-LED, Dkt. No. 497 (August 8, 2005).

[44] *Soverain Software LLC v. Amazon, Inc.*, Case No. 04-cv-00014-LED, Dkt. No. 246 (April 7, 2005).

63.     The means-plus-function claims in the '780 patent have been previously construed by the Court:

> The Court agrees with Soverain that limiting the claims beyond what is disclosed in the block diagrams is not required by case law and penalizes the inventors for submitting software code during prosecution. . . [45]

64.     The court went on to identify specific structures for the mean-plus-function elements that corresponded to the means-plus-function elements.  The below excerpt from the Court's *Markman* Order shows the means-plus-function elements and the associated structure for two exemplary terms.

| DISPUTED CLAIM TERMS | COURT'S CONSTRUCTION |
|---|---|
| **means for servicing service requests from a client which include the session identifier**<br><br>Claim 32 | Content server (element 120 in Fig. 2A and element 52 in Fig. 3), executing a computer program implementing algorithm shown in Fig. 2A, including blocks 110, 112, and 116, or the client server exchange 9 and 10 in Fig. 3. |
| **means for providing the session identifier**<br><br>Claim 33 | Authentication server (element 200 in Figs. 2A and 2B, element 54 in Fig. 3), executing a computer program implementing algorithm steps as shown in Fig. 2B, including blocks 228, 230, and 232. |

*Soverain Software LLC v. Amazon, Inc.*, Case No. 04-cv-00014-LED, Dkt. No. 246 at 24 (April 7, 2005).

65.     One or more of the claims of the '780 patent recite a means or step for performing a specified function.  The corresponding structure(s) in the '780 patent specification and appendix include computer code that improves the functioning of a computer.  '780 patent, cols. 11-114.

66.     One or more of the claims in the '780 patent recite means-plus-function claim limitations governed by 35 U.S.C. § 112, ¶ 6.

---

[45] *Id.* at 9.

67.     The '780 patent discloses computer algorithms in an appendix to the specification. In addition to the structures and algorithms disclosed throughout the specification, these algorithms correspond to means-plus-function claims in the '780 patent.



'780 patent, cols. 11-114 (excerpt of some of the computer algorithms disclosed in an appendix to the specification).

68.     Means-plus-function claims such as those included in the '780 patent are inherently not abstract ideas.  In *Enfish LLC v. Microsoft Corp.*, the Federal Circuit upheld the patentability of claims containing means-plus-function elements.  "Accordingly, we find that the claims at issue in this appeal are not directed to an abstract idea within the meaning of *Alice*. Rather, they are directed to a specific improvement to the way computers operate, embodied in the self-referential table."  822 F.3d 1327, 1336 (Fed. Cir. 2016).  Stanford Law Professor Mark Lemley described the basis for means-plus-function elements conferring patentability:

> If the patent is interpreted as a means-plus-function claim, it will be limited to the particular software implementation the patentee actually built or described.  Such a narrow, specific claim should not be an unpatentable "abstract idea."[46]

---

[46] Mark A. Lemley, *Software Patents and the Return of Functional Claiming*, 2013 WISC. L. REV. 905 (2013).

69.    The '780 patent has been cited by 1,840 United States patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '780 patent as relevant prior art.

- International Business Machines Corporation (cited in 61 patents and patent applications)
- Microsoft Corporation (cited in 62 patents and patent applications)
- Oracle Corporation
- Amazon.com, Inc.
- AT&T Corp.
- Cisco Systems, Inc.
- Dell, Inc.
- eBay, Inc.
- First Data Corporation
- Google, Inc.
- Hewlett-Packard Company
- Level 3 Communications, LLC
- Mcaffe, Inc.
- Ricoh Co., Ltd.
- Yahoo!, Inc.
- Xerox Corporation
- NEC Corporation
- Goldman Sachs & Co.
- Facebook, Inc.
- Comcast Corporation
- Intel Corporation
- Akamai Technologies, Inc.

70.    The '780 patent relates to methods for controlling and monitoring access to network servers through the use of a session identifier. This session identifier allows web servers to recognize and service multiple requests from the same client and control access to the server without repeated authentication.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 7,191,447

71.    Soverain references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

72.    Charter and Spectrum-TWCI design, make, use, sell, and/or offer for sale in the United States products and/or services for extracting data from sources of network-based information.

73.    Charter and Spectrum-TWCI design, make, sell, offer to sell, import, and/or use the Spectrum Website (www.spectrum.net and www.spectrum.com) (the "Spectrum '447 Product(s)").

74.    On information and belief, Charter and Spectrum-TWCI use the Spectrum '447 Products in regular business operations.

75.    On information and belief, one or more of the Spectrum '447 Products include technology for extracting data from sources of network-based information in a communications network having a plurality of network servers programmed to transmit network-based information.  For example, www.spectrum.net/tv/guide/ enables extracting data from sources of network based information.



*Spectrum Website Network Inspection Report*, SPECTRUM WEBSITE, available at: http://www.spectrum.net/tv/guide/ (last visited March 2017).

76.    On information and belief, one or more of the Spectrum '447 Products enable an object embedding program implemented on a computer.  The object embedding program contains functionality to locate a script program.

77.    On information and belief, the Spectrum '447 Products are available to businesses and individuals throughout the United States.

78.    On information and belief, the Spectrum '447 Products are provided to businesses and individuals located in the Eastern District of Texas.

79.    On information and belief, the Spectrum '447 Products comprise a system containing functionality for a script program that is implemented on a computer on a communication network.



*Spectrum Website Memory Tree Map Report*, SPECTRUM WEBSITE, available at: http://www.spectrum.net/tv/guide/ (last visited March 2017).

80.    On information and belief, the Spectrum '447 Products contain a script program wherein the script program is structured to extract data from network-based information provided by a networked server.

81.    On information and belief, the Spectrum '447 Products contain an object embedding program, implemented on computers.  The object embedding program implemented on the '447 Product comprises a link to said network-based information provided by a networked server.

| Method | File | Domain | Cause | Type |
|---|---|---|---|---|
| GET | core.min.js | d1ff979u6gd5fc.cloudfront.net | script | js |
| GET | utag.js | tags.tiqcdn.com | script | js |
| GET | WE2H4-X442H-4T5HZ-9BQT4-YQRQT | c-go-mpulse.net | script | js |
| GET | utag.167.js?utv=201703012147 | tags.tiqcdn.com | script | js |
| GET | guide-dist.js | d1ff979u6gd5fc.cloudfront.net | script | js |
| GET | artexpo_123846_v14.js | www.spectrum.net | script | js |
| GET | head.min.js | d1ff979u6gd5fc.cloudfront.net | script | js |
| GET | commentcard_119964.js | www.spectrum.net | script | js |
| GET | wrapper_self_hosted.js | www.spectrum.net | script | js |
| GET | update.js | browser-update.org | script | js |
| GET | browser-update.js | d1ff979u6gd5fc.cloudfront.net | script | js |
| GET | event?d_nsid=0&d_ld=_ts=1491287053748&d_rtbd=json&d_jsonv=1&d_dst=... | charter.demdex.net | script | js |
| GET | iperceptions.min.js | www.spectrum.net | script | js |
| GET | force-www-domain.js | d1ff979u6gd5fc.cloudfront.net | script | js |
| GET | config.js?key=WE2H4-X442H-4T5HZ-9BQT4-YQRQT&d=www.spectrum.net... | c-go-mpulse.net | script | js |

*Spectrum Website Network Inspection Report*, SPECTRUM WEBSITE, available at: http://www.spectrum.net/tv/guide/ (last visited March 2017).

82.    On information and belief, the Spectrum '447 Products enable an object embedding program to (via a link) locate a script program.

83.    On information and belief, the Spectrum '447 Products enable an object embedding program that is structured to apply the script program to the network-based information.  The application of the script program causes data to be extracted from a networked server.

```
1  angular.module("recordAssetModal", [
2      "api.device.device",
3      "showModal", "cc.modal",
4      "ccTrack"
5  ]).factory("recordEpisode", [
6      "ccModal", "$rootScope",
7      function(a, b) {
8          return {
9              asset: [],
10             setAsset: function(
11                 a, b, c) {
12                 this.asset =
13                     a, this
14                     .asset.delivery =
15                     b, _.isUndefined(
16                         c) ||
17                     (this.asset
18                         .device =
19                         c)
20             },
21             getAsset: function() {
22                 return this
23                     .asset
24             },
25             show: function() {
26                 var c = b.$new();
27                 c.modal = {
28                     contentSrc: "/assets/templates/features/record-asset-modal/record-asset-modal-tmp1.html",
29                     title: "Setup Your Recording"
30                 }, c.modal
31                     .instance =
32                     a.open({
33                         scope: c,
34                         buttons:
```

*Spectrum Website Guide-dist.js Response Report*, SPECTRUM WEBSITE, available at: http://d1ff979u6gd5fc.cloudfront.net/api/static-assets/assets/2.24.8/603/tv/guide/guide-dist.js (last visited March 2017).

84.    On information and belief, the Spectrum '447 Products enable the embedding of data in a compound document that is on the communications network.

SOVERAIN COMPLAINT FOR PATENT INFRINGEMENT

85.     On information and belief, the Spectrum '447 Products enable the object embedding program to locate the script program via a link.  Further, the '447 Products enable the network-based information to be linked to the scripting program.



*Spectrum Website Guide-dist.js Request and Response Header Report*, SPECTRUM WEBSITE, available at: http://d1ff979u6gd5fc.cloudfront.net/api/static-assets/assets/2.24.8/603/tv/guide/guide-dist.js (last visited March 2017).

86.     On information and belief, the Spectrum '447 Products comprise a system for executing an object embedding program to embed said data within a compound document implemented on a computer in said communications network.



*Spectrum Website TV Guide*, SPECTRUM WEBSITE, available at: http://www.spectrum.net/tv/guide/ (last visited March 2017).

87.     On information and belief, Charter and Spectrum-TWCI have directly infringed and continue to directly infringe the '447 patent by, among other things, making, using, offering for sale, and/or selling technology for extracting data from sources of network-based information, including but not limited to the Spectrum '447 Products, which include infringing technology for managing transfers of information in a communications network.  Such products and/or services include, by way of example and without limitation, the Spectrum '447 Products.

88.     By making, using, testing, offering for sale, and/or selling products and services, including but not limited to the Spectrum '447 Products, Charter and Spectrum-TWCI has injured Soverain and is liable to Soverain for directly infringing one or more claims of the '447 patent, including at least claim 5, pursuant to 35 U.S.C. § 271(a).

89.     On information and belief, Charter and Spectrum-TWCI also indirectly infringe the '447 patent by actively inducing infringement under 35 USC § 271(b).

90.     On information and belief, Charter and Spectrum-TWCI had knowledge of the '447 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Charter and Spectrum-TWCI knew of the '447 patent and knew of their infringement, including by way of this lawsuit.

91.     On information and belief, Charter and Spectrum-TWCI intended to induce patent infringement by third-party customers and users of the Spectrum '447 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Charter and Spectrum-TWCI specifically intended and were aware that the normal and customary use of the accused products would infringe the '447 patent.  Charter and Spectrum-TWCI performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '447 patent and with the knowledge that the induced acts would constitute infringement.  For example, Charter and Spectrum-TWCI provides the Spectrum '447 Products that have the capability of operating in a manner that infringe one or more of the claims of the '447 patent, including at least claim 5, and Charter and Spectrum-TWCI further provide documentation and training materials that cause customers and end users of the Spectrum '447 Products to utilize the products in a manner that directly infringe one or more claims of the '447 patent.[47]  By providing instruction and training to customers and end-users on how to use the Spectrum '447 Products in a manner that directly infringes one or more claims of the '447 patent, including at least claim 5, Charter and Spectrum-TWCI specifically intended to induce infringement of the '447 patent.  On information and belief, Charter and Spectrum-TWCI engaged in such inducement to promote the sales of the Spectrum '447 Products, e.g., through user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '447 patent.  Accordingly, Charter and Spectrum-TWCI have induced and continue to induce

---

[47] *Spectrum.net Support*, SPECTRUM WEBSITE, available at: http://www.spectrum.net/support/ (last visited March 2017); *Get to Know Spectrum.net*, SPECTRUM WEBSITE, available at: http://www.spectrum.net/support/general/welcome-all-new-spectrumnet/ (last visited March 2017); *Spectrum Guide Welcome Kit*, SPECTRUM USER MANUAL (2016); *Spectrum Website Terms and Conditions*, SPECTRUM WEBSITE, available at: https://www.charter.com/policies/website-terms.html (last visited March 2017); *Ask Time Warner Website Functionality*, SPECTRUM / TIME WARNER WEBSITE, available at: https://myservices.timewarnercable.com/ (last visited March 2017).

users of the accused products to use the accused products in their ordinary and customary way to infringe the '447 patent, knowing that such use constitutes infringement of the '447 patent.

92.     The '447 patent is well-known within the industry as demonstrated by the over 135 citations to the '447 patent in published patents and patent applications assigned to technology companies and academic institutions.  Several of Charter and Spectrum-TWCI's competitors have paid considerable licensing fees for their use of the technology claimed by the '447 patent.  In an effort to gain an advantage over Charter and Spectrum-TWCI's competitors by utilizing the same licensed technology without paying reasonable royalties, Charter and Spectrum-TWCI infringed the '447 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

93.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '447 patent.

94.     As a result of Charter and Spectrum-TWCI's infringement of the '447 patent, Soverain has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Charter and Spectrum-TWCI's infringement, but in no event less than a reasonable royalty for the use made of the invention by Charter and Spectrum-TWCI together with interest and costs as fixed by the Court.

## COUNT II
### INFRINGEMENT OF U.S. PATENT NO. 8,606,900

95.     Soverain references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

96.     Charter and Navisite design, make, use, sell, and/or offer for sale in the United States products and/or services for tracking web page requests received at a web server.

97.    Charter and Navisite design, make, sell, offer to sell, import, and/or use the NaviCloud Sphere AppCenter[48] and Navisite Managed Webhosting (which provides Apache and Microsoft IIS webservers) (the "Spectrum '900 Product(s)").

98.    On information and belief, Charter and Navisite use the Spectrum '900 Products in regular business operations.

99.    On information and belief, one or more of the Spectrum '900 Products include technology for tracking webpage requests received at a web server from multiple clients.

> Navisite offers *three package levels of Web Server Management for both infrastructure options*. Highlights of these packages include:
> - Basic - Best for clients with small user bases who require minimal support delivered Monday through Friday during Navisite's standard business hours.
> - Classic - Best for clients with mid-size user bases who require 24-hour support delivered Monday through Friday. Provides support for more incidents per month than the Basic package, infrastructure management and advanced monitoring. Also, the lowest package in which support for vendor applications is included.
> - Premium - Best for clients with large user bases who require 24x7 support. Provides support for unlimited incidents, *enhanced infrastructure management, advanced monitoring and web analytics*. Also provides a yearly DR test, release upgrade support, performance tuning and case-by-case problem management.

*Navisite Webserver Management,* NAVISITE SERVICE BRIEF at 2 (2016) (emphasis added).

100.    On information and belief, the Spectrum '900 Products generate multiple session identifiers. The session identifiers that are generated by the Spectrum '900 Products are text strings that identify a series of requests and responses to perform a complete task or set of tasks between a client and a server system.

101.    On information and belief, the Spectrum '900 Products generate session identifiers that have information associated with a particular accessing computer where the accessing computer is make a webpage request to the web server.

---

[48] *See NaviCloud Sphere Self-Paced Introductory Tutorial*, NAVISITE TUTORIAL, *available at:* https://navicloud.navisite.com/help/ (last visited March 2017 ("NaviCloud® Sphere's AppCenter is a configuration portal that provides the access and graphical tools you need to administer and manage your cloud services and resources. AppCenter is a web-based console for creating, managing, and monitoring virtual machines, the network, or global resources on the NaviCloud Sphere platform.").

102.    On information and belief, the Spectrum '900 Products enable the storing of the session identifiers at the accessing computer in the accessing computer's web browser.  For example, if an accessing computer is running a browser such as Microsoft Internet Explorer or Mozilla Firefox where session identifier is stored in the web browser.



*NaviCloud AppCenter Self-Paced Introductory Tutorial*, NAVIAPP CENTER WEBSITE, available at: https://navicloud.navisite.com/help/NetHelpIntroTut/ (last visited March 2017) (showing the NaviSite NaviApp supports provisioning of IIS servers and IIS features).

103.    On information and belief, the Spectrum '900 Products enable the receipt of web page requests at the web server.  Each web page request includes a session identifier associated with a particular client making the web page request.  Specifically, the Spectrum '900 Products

receive requests from accessing computers wherein the each request for a web page includes the session identifier associated with the requesting computer.

104.    On information and belief, the Spectrum '900 Products enable storing data regarding the web page requests.  The data includes the webpage that is requested and the session identifiers associated with the request.  Specifically, the Spectrum '900 Products keep a log of access requests wherein the log incudes the requests for specific web pages and related session identifiers.  Navisite states that its "Managed Web Server services including implementing, configuring, monitoring, maintaining, upgrading and patching for Web servers hosted within Navisite data centers."[49]



*Port-based Network Address Translation (NAT) and Connecting to Front-End Addresses,* NAVICLOUD APPCENTER HELP FILE, available at: https://navicloud.navisite.com/help/ (last visited March 2017). ("The example procedure ties together firewall and service configuration to describe how you could get a web server in your cloud environment onto the internet and functional for the WWW.").

105.    On information and belief, the Spectrum '900 Products are provided to businesses and individuals located in the Eastern District of Texas.

---

[49] *Navisite - Managed Hosting Enterprise,* NAVISITE WEBSITE, available at: www.navisite.com/services/hosting-services/managed-web-server (last visited March 2017).



Ray Glass, *Moving from Scramble to Strategy with Cloud,* NAVISITE PRESENTATION at 13 (2016).

106.    On information and belief, the Spectrum '900 Products enable the tracking of webpage requests by evaluating the information stored at the web server and by counting the number of requests for particular web pages exclusive of repeated requests from a particular client utilizing information associated with a particular client.  Specifically, the Spectrum '900 Products contain website analytics functionality that allows tracking the number of webpage requests that exclude multiple requests from the same computer associated with a unique session identifier.

107.    On information and belief, the Spectrum '900 Products enable counting the number of requests for a webpage wherein the counting performed by the Spectrum '900 Products excludes repeated requests from a particular client computer that occur within a predetermined period of time, and thereafter counts a repeated request for the same web page from the particular client.  Specifically, the Spectrum '900 Products enable frequency thresholds that exclude counting access requests where the frequency exceeds a specific threshold within a set period of time.

108.    On information and belief, Charter and Navisite have directly infringed and continue to directly infringe the '900 patent by, among other things, making, using, offering for sale, and/or selling web tracking technology, including but not limited to the Spectrum '900

Products, which include infringing web server tracking technologies.  Such products and/or services include, by way of example and without limitation, the Spectrum '900 Products.



*NaviCloud AppCenter Self-Paced Introductory Tutorial*, NAVIAPP CENTER WEBSITE, available at: https://navicloud.navisite.com/help/NetHelpIntroTut/ (last visited March 2017) ("The browser displays the IIS Welcome screen, indicating that your web service is operational.").

109.     By making, using, testing, offering for sale, and/or selling web tracking products and services, including but not limited to the Spectrum '900 Products, Charter and Navisite have injured Soverain and is liable to Soverain for directly infringing one or more claims of the '900 patent, including at least claims 1 and 5, pursuant to 35 U.S.C. § 271(a).

110.     On information and belief, Charter and Navisite also indirectly infringe the '900 patent by actively inducing infringement under 35 USC § 271(b).

111.     On information and belief, Charter and Navisite had knowledge of the '900 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Charter and Navisite knew of the '900 patent and knew of their infringement, including by way of this lawsuit.

112.     On information and belief, Charter and Navisite intended to induce patent infringement by third-party customers and users of the Spectrum '900 Products and had

knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Charter and Navisite specifically intended and were aware that the normal and customary use of the accused products would infringe the '900 patent.  Charter and Navisite performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '900 patent and with the knowledge that the induced acts would constitute infringement.  For example, Charter and Navisite provide the Spectrum '900 Products that have the capability of operating in a manner that infringe one or more of the claims of the '900 patent, including at least claims 1 and 5, and Charter and Navisite further provide documentation and training materials that cause customers and end users of the Spectrum '900 Products to utilize the products in a manner that directly infringe one or more claims of the '900 patent.[50]  By providing instruction and training to customers and end-users on how to use the Spectrum '900 Products in a manner that directly infringes one or more claims of the '900 patent, including at least claims 1 and 5, Charter and Navisite specifically intended to induce infringement of the '900 patent.  On information and belief, Charter and Navisite engaged in such inducement to promote the sales of the Spectrum '900 Products, *e.g.*, through user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '900 patent.  Accordingly, Charter and Navisite have induced and continue to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '900 patent, knowing that such use constitutes infringement of the '900 patent.

113.    The '900 patent is well-known within the industry as demonstrated by the over 139 citations to the '900 patent in published patents and patent applications assigned to technology companies and academic institutions.  Several of Charter and Navisite's competitors

---

[50] See e.g., *Port-based Network Address Translation (NAT) and Connecting to Front-End Addresses,* NAVICLOUD APPCENTER HELP FILE, available at: https://navicloud.navisite.com/help/; *NaviCloud AppCenter Self-Paced Introductory Tutorial,* NAVIAPP CENTER WEBSITE, available at: https://navicloud.navisite.com/help/NetHelpIntroTut/; Ray Glass, *Moving from Scramble to Strategy with Cloud,* NAVISITE PRESENTATION at 13 (2016); *Navisite Webserver Management,* NAVISITE SERVICE BRIEF at 2 (2016).

have paid considerable licensing fees for their use of the technology claimed by the '900 patent.
To gain an advantage over Charter and Navisite's competitors by utilizing the same licensed
technology without paying reasonable royalties, Charter and Navisite infringed the '900 patent in
a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously
wrongful, flagrant, or characteristic of a pirate.

114.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met
with respect to the '900 patent.

115.    As a result of Charter and Navisite's infringement of the '900 patent, Soverain has
suffered monetary damages, and seeks recovery in an amount adequate to compensate for
Charter and Navisite's infringement, but in no event less than a reasonable royalty for the use
made of the invention by Charter and Navisite together with interest and costs as fixed by the
Court.

## COUNT III
## INFRINGEMENT OF U.S. PATENT NO. 5,708,780

116.    Soverain references and incorporates by reference the preceding paragraphs of
this Complaint as if fully set forth herein.

117.    Charter and Spectrum-TWCI designed, made, used, sold, and/or offered for sale
in the United States products and/or services for processing service requests from a client to a
server system through a network.

118.    Charter and Spectrum-TWCI designed, made, sold, offered to sell, imported,
and/or used the Time Warner website (www.timewarnercable.com) (the "Spectrum '780
Product(s)").

119.    On information and belief, Charter and Spectrum-TWCI used the Spectrum '780
Products in regular business operations.

120.    On information and belief, one or more of the Spectrum '780 Products include
technology for processing service requests from a client to server system through a network.

121.    On information and belief, one or more of the Spectrum '780 Products append to a path name in a uniform resource locator a session identifier.  Specifically, the Spectrum '780 Products tag, add, affix, or supplement to the sequence of zero or more elements that follows the host address in a URL a text string that identifies a session.



Time Warner Website Network Inspection Report, TIME WARNER WEBSITE, available at: https://www.timewarnercable.com/residential/order/session/ (last visited March 2017) (showing some of the content loaded in a page that appends the Session ID).

122.    On information and belief, one or more of the Spectrum '780 Products process service requests between a client and server using hypertext transfer protocol.  Specifically, the Spectrum '780 Products process service requests using a client/server protocol used to access information on the World Wide Web.



*Time Warner Packages,* Time Warner Website, available at: https://www.timewarnercable.com/residential/order/ (last visited March 2017) (appending to the URL a unique Session ID that is used to track the use. The session is identified with a unique 32 character text string).

123.     On information and belief, one or more of the Spectrum '780 Products return requests hypertext pages to a client in response to requests for hypertext pages received from the client through a network. Specifically, the Spectrum '780 Products return requests for screen renderings referenced by (or including) hypertext links.

124.     On information and belief, the Spectrum '780 Products respond to further client requests related to links in hypertext pages. Specifically, the Spectrum '780 Products respond to requests from a client computer relating to a non-sequential web association which the user can use to navigate through related topics.

125.     On information and belief, the Spectrum '780 Products track further requests from a client computer relating to a particular hypertext page. Specifically, the Spectrum '780 Products track additional client computer requests for screen rendering referenced by (or including) hypertext links.

126.    On information and belief, the Spectrum '780 Products enable the use of a session identifier where the session identifier is a common session identifier and the server tracks client request within a session of requests.

127.    On information and belief, the Spectrum '780 Products have been provided, sold, and/or offered for sale to businesses and individuals located in the Eastern District of Texas.

128.    On information and belief, the Spectrum '780 Products contain a means for receiving service requests from clients and for determining whether a service request includes a session identifier. Specifically, the Spectrum '780 Products contain a content server as shown in the '780 patent specification at element 120 in Fig. 2A and element 52 in Fig. 3, executing a computer program implementing algorithm steps as shown in Fig. 2A, including block 104, and equivalent structures.

129.    On information and belief, the Spectrum '780 Products enable methods for controlling and monitoring access to network servers through the use of a session identifier. Further, the Spectrum '780 Products utilize a session identifier that allows web servers to recognize and service multiple requests from the same client and control access to the server without repeated authentication.

130.    On information and belief, the Spectrum '780 Products contain a means for appending the session identifier as part of a path name in a uniform resource locator in response to an initial service request in a session of requests. Specifically, the Spectrum '780 Products contain an authentication server as shown in the '780 Patent specification at element 200 in Figs. 2A and 2B, element 54 in Fig. 3, executing a computer program implementing algorithm steps as shown in Fig. 2B, including blocks 228, 230, and 232, and equivalent structures.

131.    On information and belief, the Spectrum'780 Products comprise means for servicing service requests from a client which include a session identifier where subsequent service requests are processed in the session. Specifically, the Spectrum '780 Products comprise a content server as shown in the '780 Patent specification at element 120 in Fig. 2A and element 52 in Fig. 3, executing a computer program implementing algorithm shown in Fig. 2A, including

blocks 110, 112, and 116, or the client server exchange 9 and 10 in Fig. 3, and equivalent structures.

132.    On information and belief, the Spectrum '780 Products comprise a means for providing a session identifier.  Specifically, the Spectrum '780 Products comprise an authentication server as shown in the '780 Patent specification at element 200 in Figs. 2A and 2B, and element 54 in Fig. 3, executing a computer program implementing algorithm steps as shown in Fig. 2B, including blocks 228, 230, and 232, and equivalent structures.

133.    On information and belief, the Spectrum '780 Products enable the use of a uniform resource locator that includes a transfer protocol identifier, a host name, one or more directory names, and a file name.



*Time Warner Webpage Header Inspection Report,* Time Warner Website, available at: https://www.timewarnercable.com/residential/order/ (last visited March 2017) (showing that the session ID is appended to requests made for further content).

134.    On information and belief, the Spectrum '780 Products enable the use of session identifier where the session identifier is appended to the path name in the uniform resource locator between the transfer protocol identifier and the file name.  Specifically, the Spectrum '780 Products use a text string that identifies a series of requests and responses to perform a complete task or set of tasks between a client and a server system.  The Spectrum '780 Products tag, add, affix, or supplement the text string that identifies a session to the sequence of zero or

more elements that follows the host address in a URL between the transfer protocol identifier and file name.

135.    On information and belief, the Spectrum '780 Products comprise a server system that tracks access history information within a client-server session.

136.    On information and belief, the Spectrum '780 Products use a session identifier that enables the client to access files within a protected domain.  Specifically, the Spectrum '780 Products use a text string that identifies a session to enable a client computer to access files within a protected domain.

137.    On information and belief, the Spectrum '780 Products enable the use of a session identifier to access files with a plurality of servers.

138.    On information and belief, the Spectrum '780 Products enable the use of a client computer running a web browser (e.g., Internet Explorer) and a web server where the session of requests include hypertext transfer protocol GET requests transmitted from the web browser on the client computer to the web server.  Further, the Spectrum '780 Products use GET requests which include a uniform resource locator having the session identifier appended to it.  Specifically, the GET requests include a text string that identifies a session where the text string is tagged, added, affixed, or supplemented to the URL as part of a path name.

139.    On information and belief, Spectrum has directly infringed the '780 patent by, among other things, having made, used, offered for sale, and/or sold technology for processing service requests from a client to a server system over a computer network, including but not limited to the Spectrum '780 Products, which include infringing technologies for processing service requests from a client to a server system over a computer network.  Such products and/or services include, by way of example and without limitation, the Spectrum '780 Products.

140.    By having made, used, tested, offered for sale, and/or sold products and services for processing service requests from a client to a server system over a computer network, including but not limited to the Spectrum '780 Products, Charter and Spectrum-TWCI have injured Soverain and are liable to Soverain for directly infringing one or more claims of the '780

patent, including at least claims 22, 23, 32, 33, 112-114, 127, 128, and 129, pursuant to 35 U.S.C. § 271(a).

141.    The '780 patent is well-known within the industry as demonstrated by the over 1,840 citations to the '780 patent in published patents and patent applications assigned to technology companies and academic institutions.  Several of Charter and Spectrum-TWCI's competitors have paid considerable licensing fees for their use of the technology claimed by the '780 patent.  To gain an advantage over Charter and Spectrum-TWCI's competitors by utilizing the same licensed technology without paying reasonable royalties, Charter and Spectrum-TWCI infringed the '780 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

142.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '780 patent.

143.    Because of Charter and Spectrum-TWCI's infringement of the '780 patent, Soverain has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Charter and Spectrum-TWCI's infringement, but in no event less than a reasonable royalty for the use made of the invention by Charter and Spectrum-TWCI together with interest and costs as fixed by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Soverain respectfully requests that this Court enter:

A.  A judgment in favor of Plaintiff Soverain that Charter and Spectrum-TWCI have infringed, either literally and/or under the doctrine of equivalents, the '447 patent and the '780 patent;

B.  A judgment in favor of Plaintiff Soverain that Charter and Navisite have infringed, either literally and/or under the doctrine of equivalents, the '900 patent;

C.  An award of damages resulting from Charter, Spectrum-TWCI, and Navisite's acts of infringement in accordance with 35 U.S.C. § 284;

D.  A judgment and order finding that Defendant's infringement was willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate within the meaning of 35 U.S.C. § 284 and awarding to Plaintiff enhanced damages.

E.  A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Plaintiff its reasonable attorneys' fees against Defendant.

F.  Any and all other relief to which Soverain may show itself to be entitled.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Soverain IP, LLC requests a trial by jury of any issues so triable by right.

Dated:    April 12, 2017                              Respectfully submitted,


                                                      /s/  Dorian S. Berger _____
                                                      Elizabeth L. DeRieux (TX Bar No.
                                                      05770585)
                                                      D. Jeffrey Rambin (TX Bar No. 00791478)
                                                      CAPSHAW DERIEUX, LLP
                                                      114 E. Commerce Ave.
                                                      Gladewater, Texas 75647
                                                      Telephone: 903-845-5770
                                                      E-mail: ederieux@capshawlaw.com
                                                      E-mail: jrambin@capshawlaw.com


                                                      Dorian S. Berger (CA SB No. 264424)
                                                      Daniel P. Hipskind (CA SB No. 266763)
                                                      BERGER & HIPSKIND LLP
                                                      1880 Century Park East, Ste. 815
                                                      Los Angeles, CA 95047
                                                      Telephone: 323-886-3430
                                                      Facsimile: 323-978-5508
                                                      E-mail: dsb@bergerhipskind.com
                                                      E-mail: dph@bergerhipskind.com

                                                      *Attorneys for Soverain IP, LLC*